## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CASE NO. ___4:18-cv-518___ |
| JAMES VANBLARICUM, RODNEY L. POPE, CHET INGLIS, MATTHEW LEAVERTON, WILLIAM HILL, ERIK RHODES, and ROBERT GILLIAM, | § § § § § § | |
| Defendants. | § § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against Defendants James VanBlaricum a/k/a James Edward a/k/a Dr. Jim, Rodney L. Pope, Chet Inglis, Matthew Leaverton, William Hill, Erik Rhodes, and Robert Gilliam (collectively "Defendants"), and alleges as follows:

## I.
## SUMMARY

1.      From at least May 2013 through August 2016, Defendants defrauded hundreds of investors out of more than $10 million in connection with various securities offerings conducted for the purported purposes of drilling oil and gas wells and investing in leased mineral interests and drilling-related equipment.  Defendants operated their fraud through a limited liability company called Texas Energy Mutual, LLC ("TEM").  Defendants, through TEM, solicited investors from multiple states, luring them to invest in the fraudulent and unregistered offerings

through a combination of high-pressure and deceptive sales pitches and false and misleading offering materials.

2.       VanBlaricum, a securities fraud recidivist, was the driving force behind the scheme, but because he had a history of operating fraudulent investment schemes, he concealed his involvement by recruiting Pope and Inglis to serve as TEM's public faces.  Despite Pope's and Inglis's apparent authority at TEM, however, VanBlaricum was in control, and Pope and Inglis answered to him.  Meanwhile, Leaverton, Hill, Rhodes, and Gilliam functioned as TEM's core salesforce and investor relations team, with VanBlaricum, Pope, and Inglis also occasionally selling securities.  These defendants sold offerings in TEM's two main oil and gas programs, known as "Thunderhead" and the "Mineral Interest Lease Program" ("MILP"), despite not being registered as, or associated with, a registered broker-dealer.

3.       The offering materials for both programs contained materially false and misleading representations and omitted material facts.  Significantly, they deliberately omitted VanBlaricum's control of TEM and his history and roles in two prior fraudulent investment schemes, although all of the Defendants knew that VanBlaricum was using an alias.  In the Thunderhead program, the offering materials also failed to disclose excessive commissions to sales personnel while, the MILP program, an investment in mineral leases and equipment in which investors received promissory notes, falsely guaranteed a 10% annual return and full repayment of the notes within three years.  In addition, VanBlaricum and Pope misappropriated investor funds, spending them on such personal expenses as a dating website, luxury international vacations, and payments to disgruntled investors to prevent complaints.

4.     In August 2016, federal criminal authorities raided TEM's operations and arrested VanBlaricum.  Since then, VanBlaricum, Pope, Inglis, Leaverton, and Gilliam have pleaded guilty to various mail and wire fraud charges in connection with this scheme.

5.     By reason of these activities and the conduct described in more detail below, each of the Defendants has violated and, unless enjoined, will continue to violate the antifraud, securities-registration, and broker-dealer registration provisions of the federal securities laws, specifically Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

6.     The Commission seeks permanent injunctive relief, officer and director bars, disgorgement of ill-gotten gains resulting from Defendants' violations, prejudgment interest thereon, and civil penalties.

## II.
## JURISDICTION AND VENUE

7.     Defendants offered and sold to investors and prospective investors securities in the form of units in oil-and-gas drilling programs and promissory notes purportedly backed by oil and gas assets.  The notes and the drilling program units (which were investment contracts) are securities under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b] and Section 3(a)(10) of the Exchange Act [15 U.S.C. §78c].  As such, the Court has jurisdiction over this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.     Venue is proper because a substantial part of the events and omissions giving rise to the claims occurred within the Northern District of Texas, Fort Worth Division.  TEM maintained its headquarters and principal place of business in Grapevine, Tarrant County, Texas,

where the Defendants engaged in their solicitation activities.  In addition, VanBlaricum, Pope,

Inglis, Gilliam, and Hill resided in Tarrant County at the time of the actions described herein.

## III.
## DEFENDANTS

9.      **James E. VanBlaricum**, 79, formerly of Colleyville, Texas, is now in the

custody of the United States Bureau of Prisons at El Reno Federal Correctional Institute, in El

Reno, Oklahoma.  He was the *de facto* head of TEM and is a securities fraud recidivist.  In

connection with his conduct related to TEM and the prior scheme, called Signal Oil and Gas

Company ("Signal"), VanBlaricum pleaded guilty to mail fraud, was sentenced to seven years in

prison, and was ordered to pay restitution of $32,370,943.25.  He has never held a securities

license, but he operated two other fraudulent securities schemes in the past, Signal and another

company called Kimberley Oil and Gas Company.

10.     **Rodney L. Pope,** 60, resides in Bedford, Texas, and was one of TEM's two

managing members.  He pleaded guilty to conspiracy to commit mail fraud, was sentenced to

four years in prison, and was ordered to pay restitution of $13,547,407.09.  Pope previously

worked as a salesman for VanBlaricum at Signal.  Pope previously held Series 22 and Series 63

licenses, but both were terminated by 2007.  In 1997, the Texas State Securities Board

sanctioned Pope for failing to disclose several theft-by-check violations.

11.     **Chet Inglis**, 44, resides in Fort Worth, Texas, and was one of TEM's two

managing members.  In addition to being a part owner, Inglis worked as a salesperson and was

responsible for TEM's marketing and website design.  He pleaded guilty to conspiracy to

commit mail fraud, was sentenced to two and a half years in prison, and was ordered to pay

restitution of $1,805,480.67.  Inglis has never held a securities license and did not have prior

experience in the oil and gas industry before working at TEM.

12.      **Matthew Leaverton**, 40, resides in Garland, Texas, and served as TEM's Senior Director, in addition to selling its investments.  He pleaded guilty to conspiracy to commit mail fraud, was sentenced to five years in prison, and was ordered to pay restitution of $13,547,407.09.  Before TEM, Leaverton worked for several years as a salesperson in the oil and gas industry for other companies.  He previously held Series 22 and Series 63 licenses, but both were terminated by 2005.

13.      **Robert ("Bobby") Gilliam**, 49, lives in Hurst, Texas.  He was TEM's Director of Participant Relations and a salesperson.  He pleaded guilty to conspiracy to commit mail fraud, was sentenced to five years in prison, and was ordered to pay restitution of $13,547,407.09. He has never held a securities license and has prior convictions for burglary and delivery of controlled substances.

14.      **William "Bill" Hill**, 60, resides in Keller, Texas.  He was a salesman for TEM and has worked in the oil and gas industry for approximately 20 years.  He previously owned Tri-Crescent Energy Corp., which offered and sold oil and gas investments.  At least four states—Pennsylvania, Wisconsin, California, and Alabama—ordered Tri-Crescent and/or Hill to cease-and-desist from selling securities from 2001 to 2010.  Hill previously held Series 22 and Series 63 licenses, but those were terminated by 1999.

15.      **Erik Rhodes**, 50, lives in Rochester, New York.  He was a TEM salesman and facilitated self-directed IRA investments in TEM's offerings.  He worked at TEM from September 1, 2015 to June 27, 2016.  Rhodes previously held Series 6, 7, 24, 63, and 65 licenses, but all had been terminated by 2011.  Rhodes has no known disciplinary history.

**IV.**
**STATEMENT OF FACTS**

**A.      VanBlaricum's Past Fraudulent Schemes.**

16.      VanBlaricum has a history of operating fraudulent investment schemes.  In the early-to-mid-1970s, VanBlaricum created Kimberly Oil and Gas Company ("Kimberly"), which offered and sold fractional undivided working interests in oil and gas leases.

17.      On September 15, 1975, the Commission sued VanBlaricum and Kimberly, alleging that they wrongfully obtained money from investors in violation of the antifraud provisions of the federal securities laws.  *SEC v. Kimberly Oil & Gas Co., et al.,* Civil Action File No. A-75-CA-149 (W.D. Tex. 1975).  VanBlaricum and Kimberly settled with the Commission by consenting to a permanent injunction that enjoined them from future violations of the antifraud provisions of the securities laws.

18.      In 2000, VanBlaricum incorporated, controlled, and operated Signal, which offered several oil and gas investment programs and was the precursor to TEM.  Signal raised significant amounts of money, which was not used for the purposes described to investors in Signal's offering materials and which was, in fact, misused.

19.      VanBlaricum used more than half of Signal's investor funds to fund Signal's employee payroll and for his day-trading activities.  Signal ultimately went out of business after multiple investor complaints, including complaints filed with the Texas State Securities Board and the Illinois Secretary of State, Securities Department.  The Illinois Securities Department issued a cease and desist order against Signal in 2011.[1]

---

[1] *In the Matter of Signal Oil & Gas Co., et al.*, File No. 1000013 (Ill. Sec. Dept. 2011).

**B.      Creation of TEM.**

20.      As Signal's problems mounted, VanBlaricum shifted to a new entity, which he

called "Texas Energy Management."

21.      After another company named "Texas Energy Management" complained about

the use of that name, VanBlaricum directed Pope and Inglis to incorporate "Texas Energy

Mutual, LLC" ("TEM") in 2013, to avoid any further name confusion.  The incorporation

documents identified Pope and Inglis as the sole members of the limited liability company.  Pope

supervised the sales staff for the new company, and Inglis managed its website and marketing

efforts.  But despite lacking an official title, VanBlaricum unquestionably remained in charge of

TEM, providing its initial capitalization and controlling its actions.

22.      Leaverton, Gilliam, Hill, and Rhodes solicited investors by cold calling them, or

assisting other salespeople with calls, provided investors with sales materials and advice, and

closed sales.

**C.      TEM's Offerings.**

23.      Starting in approximately 2011, and continuing through August 2016, TEM sold

investments in two different oil and gas investment programs—known as "Thunderhead" and

"Mineral Interest Lease Program" (or "MILP")—to hundreds of investors.  VanBlaricum, Pope,

and Inglis drafted the offering documents, including brochures that described the two programs.

As a starting point for the MILP offering materials, they used documents from VanBlaricum's

Signal fraud as a template.

24.      The "Thunderhead" program consisted of several, sequential offerings of multi-

well drilling programs, all offered under the "Thunderhead" name but with different Roman

numerals attached to them.  By 2016, TEM was offering Thunderhead IV, which sought to raise

$3.6 million for a six-well drilling program in oil-and-gas prospects in Creek County, Oklahoma. In that particular program, each unit cost $120,000 and consisted of a 3.33% working interest and 2.5% net revenue interest.  Thunderhead investors signed participation documents that included an Exploration Agreement and a Turnkey Drilling and Completion Contract.  Investors purportedly obtained "Fractional Undivided Net Revenue Interest(s)" in multiple oil wells.

25.     MILP, the other investment program, was allegedly "a multifaceted land, mineral lease, and oil and gas mineral interest production investment program," which would invest in oil and gas development activities and/or in related assets.  It, too, consisted of several, sequential offerings distinguished by different Roman numerals.  The offering documents for the MILP program, which included an investment brochure, stated that the funds raised would be used to purchase land and mineral interest leases, working interests in producing wells, purchase or develop geophysical/3-D seismic data, and purchase and/or lease oil and gas drilling, production, and other associated equipment for production, storage, and transportation of oil and gas.  The MILP offering documents also represented that TEM would serve as MILP's investment manager, with full authority to buy, sell, or otherwise deal with the investments for the benefit of program participants.  Investors signed a Discretionary Investment Agreement, which designated TEM as the program manager and authorized it to make the investments with the funds raised, and TEM signed a promissory note.

26.     According to the offering documents, investors were to receive a guaranteed return of 10% per year on their promissory notes.  TEM also promised to return the investors' principal in just three years.  This guaranteed return was stated in the promissory notes that TEM signed and in the Discretionary Investment Agreement.

27.     Like the Thunderhead program, TEM offered several versions of MILP, the last one being "Mineral Interest Lease Program III."  It began October 1, 2015 and would have closed on October 1, 2016, had the criminal authorities not shut down TEM.  In that particular program, TEM offered to sell units worth $20,000 and intended to raise up to $5 million.

28.     The investments in the Thunderhead program were fractional undivided interests in oil, gas, and mineral rights.  The investments in MILP were notes, with the funds raised allegedly invested in undivided interests in oil, gas, and mineral rights, among other assets.  In both programs, investors paid cash for their interests.  Both the Thunderhead units and the MILP notes were investments in a common enterprise, in which the ability of the investors to receive returns depended on TEM's efforts and expertise to develop the wells in the Thunderhead program and on TEM's efforts to buy, sell, or otherwise deal with the mineral lease and equipment assets and investments in the MILP program.  The investors had a reasonable expectation of profits to be derived from the managerial or entrepreneurial efforts of TEM and its management.  The offering documents reflected that the investors were expected to be passive. The wells would be drilled by third-parties, and TEM had discretionary authority to make investment decisions.  TEM and its management determined which wells to drill and how to develop them in the Thunderhead program.  They also would determine which assets to buy, sell, or otherwise deal with in connection with the mineral interests and equipment in the MILP program.

29.     Even though the investments in the MILP program were labeled as promissory notes, TEM raised funds for the purported use of the business enterprise's general use and to finance substantial investments.  The investors were primarily interested in the profit these investments were to make, which would flow to them through the notes.  The notes were offered

and sold to a broad segment of the public by TEM's salesmen, who solicited investors through

lead lists, cold calls, and the TEM website.  There is no regulatory scheme that would have

significantly reduced the risk of this type of offered investment.

30.     Neither the Thunderhead nor the MILP offerings were registered with the

Commission.  These offerings did not qualify for any exemption from registration.

**D.     Misrepresentations.**

*Use of funds*

31.     In the materials provided to investors for the Thunderhead offerings, TEM

included a "Use of Proceeds" chart, detailing the items and amounts on which investor funds

would be spent, including but not limited to lease expenses, geology, rig mobilization, drilling,

chemicals and mud, drilling supervision, production pipe, completion costs, tank batteries,

wellheads, and valves, among others.  TEM used a nearly identical chart in each of the four

Thunderhead offerings that included the same amounts to be raised, the same estimated offering

expenses and fees, and virtually the same list of capital expenditures for the net proceeds.

32.     The MILP offering documents included a section titled "Potential Allocation of

Funds," which listed the items that TEM would purchase or invest in for each offering,

including: land purchases, mineral leasing expenses, reworking existing wells to increase

production, purchase or licensing of 3-D seismic data, seismic reprocessing database and

software, the purchase or operation or lease of a drilling rig to drill their own wells, mass

purchasing of production equipment (*e.g.*, pump jacks and gas compressors), and transportation

equipment.

33.     TEM, at VanBlaricum's direction, did not spend the investor proceeds in the

manner disclosed in the offering materials for either program.  Instead, he used investor funds to

pay personal expenses, including an online dating website for Russian brides, vacations, international travel, automobiles, college expenses for a "TEM-Sponsored student" who ran personal errands for VanBlaricum, and start-up costs for his son's unrelated business. Similarly, Pope used investor funds for personal expenses, including paying for his son's wedding.

34.     VanBlaricum, Pope, and Inglis also used investor proceeds from the various offerings to pay undisclosed sales commissions to TEM's salesmen. TEM salesmen, including each of the Defendants, received 30% commissions for Thunderhead program sales and 10% for MILP program sales.

35.     In addition, VanBlaricum, Pope, and Inglis regularly used funds from new investors to make Ponzi payments to previous investors. These payments were made to lull investors into believing that all was well with their investments. In fact, these payments were not based on the investments' performance.

36.     Some lulling payments were made to individuals that VanBlaricum, Pope, and Inglis referred to as "special needs" investors—investors who were upset with the lack of returns on their investments. They authorized  payments to these disgruntled investors to mollify them and prevent them from filing complaints with regulators. In some cases, investors were told they could rollover their older, non-productive investments into a new program. Defendants then ensured that they paid "returns" to those investors, using funds received from new investors, not based on the program's performance but solely to keep them happy.

37.     All of the Defendants knew about the use of funds for these purposes and openly discussed the lulling payments. VanBlaricum, Pope, Inglis, Leaverton, and Gilliam regularly discussed lulling payments at weekly meetings, and Hill and Rhodes knew about the lulling payments. Gilliam oversaw the "special needs" program and reported on the status of these

investors to the other Defendants.  Gilliam prepared letter agreements memorializing the rollover

arrangements.  VanBlaricum, Pope, and Inglis directed and/or authorized the lulling payments to

the "special needs" investors.

38.     Neither TEM nor the individual Defendants disclosed to TEM's other investors

these side agreements or related payments.

### *Guaranteed Returns*

39.     Defendants also affirmatively misrepresented the returns on the MILP investment,

telling investors that they were guaranteed an annual return of 10% per year plus the return of

their entire principal within three years.

40.     Defendants knew, however, that the MILP investments could not possibly return

10% per year and return 100% of the principal invested within three years.  VanBlaricum and

Pope knew these were false statements because they were spending the funds on their various

personal activities, rather than on the authorized investment activities set out in the offering

materials.  All of the Defendants knew that oil and gas production is generally speculative and

cannot be guaranteed, making a 10% annual rate of return for three years, with a 100%

repayment of principal unlikely.  Thus, Defendants knew that their promises of guaranteed

returns and the return of 100% of the principal were false.

### *Miscellaneous Statements*

41.     In addition to TEM's offering documents, TEM's website also made false and

misleading statements.  Among other things, the website stated that TEM (1) had a "rich" history

in the oil and gas business; (2) had programs planned for Texas; and (3) maintained a

conservative balance sheet.  Each of these statements was false.

42.     VanBlaricum, Pope, and Inglis controlled TEM and/or served as its officers. They each had access to information about TEM's financial condition and its projects and knew the company's history.  They knew that TEM did not have a "rich history." It was incorporated in 2013, and its precursor entity had been operating only as a d/b/a for a handful of years before that.  They knew that TEM did not have programs planned for Texas; the only drilling it did occurred in Oklahoma.  They also knew that the company did not maintain a conservative balance sheet because they knew that TEM's wells were either dry holes, undrilled, or insufficiently productive and that they were spending TEM's money on personal indulgences and buying the silence of disgruntled investors.

43.     VanBlaricum, Pope, and Inglis were each responsible for preparing and reviewing the website content.  Each individual had the authority to modify or remove statements on the website, but they each failed to make any changes, even though they knew these statements were false.

**E.      Omissions.**

44.     In both the Thunderhead and MILP programs, the Defendants failed to disclose to investors VanBlaricum's central role in starting, operating, and controlling TEM, and they all knew that the offering documents did not mention him.  When speaking with investors by phone or in person, the Defendants referred to VanBlaricum, if at all, by his aliases, including "James Edward" and "Dr. Jim."

45.     In TEM's incorporation documents, Pope and Inglis were listed as TEM's sole members, intentionally masking VanBlaricum's actual control.  In TEM's offering documents, Pope, Inglis, Gilliam, and Leaverton were identified as TEM's key personnel—again, masking VanBlaricum's actual control.  Further, all of the Defendants knew that VanBlaricum was not

using his real name, and Pope, Inglis, Leaverton, Gilliam, and Hill knew he was doing so to conceal his prior fraudulent securities offerings from TEM investors.

46.     Further, the offering documents omitted that TEM paid its salespeople hefty commissions.  As discussed, TEM salespeople received 30% commissions for Thunderhead program sales and 10% for MILP program sales.  Thunderhead participation documents mentioned that TEM and/or its affiliates would receive "compensation" in connection with the sale of interests, but did not accurately disclose the compensation to apprise investors that the salesmen were personally incentivized to close sales.  Likewise, the Thunderhead documents did not disclose the unreasonably high percentage of the commissions paid.  The MILP offering documents altogether failed to disclose commission payments to the salesmen at all.

47.     The Defendants also failed to disclose their commissions to investors over the phone or in face-to-face meetings when offering or selling interests in the programs.  The failure to disclose these excessive commissions was material to investors, as many would not have invested had they known the amounts or percentages of the commissions.  Each Defendant earned commissions on their sales of the TEM securities and, thus, knew that TEM was paying undisclosed commissions.

**F.     The Programs Fail.**

48.     From 2013 through August 2016, the Defendants raised more than $10 million from investors in these two TEM programs.  However, the investors lost all of their funds, as the Defendants did not spend the funds as represented in the offering documents.

49.     In Thunderhead, many of the proposed wells were never drilled.  Further, a number of the wells that were actually drilled were dry holes.  The few wells that actually

produced oil did so only for a short period of time, and never long enough to generate any

production revenue or returns for investors.

50.     The MILP program bought scant assets, if any, with investors' funds.  Instead, the

funds were commingled with those from the Thunderhead program and predominantly used as

VanBlaricum's personal piggy bank and to make Ponzi payments to earlier investors.

## V.
## CLAIMS

### FIRST CLAIM FOR RELIEF

**Violations of the Securities Registration Provisions of the Securities Act
Sections 5(a) and 5(c)  [15 U.S.C. §§ 77e(a) and 77e(c)]**

51.     The Commission repeats and re-alleges the foregoing paragraphs of this

Complaint, as if fully set forth herein.

52.     By engaging in the conduct described herein, each of the Defendants, directly or

indirectly, singly or in concert with others, (i) made use of the means or instruments of

transportation or communication in interstate commerce or of the mails to sell, through the use or

medium of a prospectus or otherwise, securities as to which no registration statement was in

effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through

the mails or in interstate commerce, by any means or instruments of transportation, securities as

to which no registration statement was in effect; or (iii) made use of means or instruments of

transportation or communication in interstate commerce or of the mails to offer to sell or offer to

buy, through the use or medium of a prospectus or otherwise, securities as to which no

registration statement had been filed.

53.     No valid registration statement was filed or was in effect with the Commission in

connection with Defendants' offers or sales of securities.

54.     There were no applicable exemptions from registration, and each Defendant therefore violated, and unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM FOR RELIEF

### Violations of the Antifraud Provisions of the Securities Act
### Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

55.     The Commission repeats and re-alleges the foregoing paragraphs of this Complaint, as if fully set forth herein.

56.     By engaging in the conduct described herein, each Defendant directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of means and instruments of transportation or communication in interstate commerce or by use of the mails: a) employed a device, scheme, or artifice to defraud; b) obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or c) engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon purchasers of securities.

57.     With regard to their violations of Section 17(a)(1) of the Securities Act, each Defendant acted intentionally, knowingly, or with severe recklessness.  With regard to their violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, Defendants acted at least negligently.

58.     By engaging in this conduct, each Defendant violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

### Violations of Antifraud Provisions of the Exchange Act
### Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

59.     The Commission repeats and re-alleges the foregoing paragraphs of this

Complaint, as if fully set forth herein.

60.     By engaging in the conduct described herein, each Defendant directly or

indirectly, singly or in concert with others, by the use of means or instrumentalities of interstate

commerce, or of the mails, or of facilities of a national securities exchange, in connection with

the purchase or sale of a security, knowingly or with severe recklessness: a) employed a device,

scheme, or artifice to defraud; b) made untrue statements of material fact or omitted to state a

material fact necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; or c) engaged in an act, practice, or course of

business which operated or would operate as a fraud or deceit upon any person.

61.     Each Defendant engaged in this conduct intentionally, knowingly, or with severe

recklessness.

62.     By engaging in this conduct, each Defendants violated, and unless enjoined, will

continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act

Rule 10b-5 thereunder [17C.F.R. §§240.10b-5].

## FOURTH CLAIM FOR RELIEF

### Violations of the Broker-Dealer Registration Provisions of the Exchange Act
### Section 15(a) [15 U.S.C. § 78o(a)]

63.     The Commission repeats and re-alleges the foregoing paragraphs of this

Complaint, as if fully set forth herein.

64.     Each Defendant, by use of the mails or means or instrumentalities of interstate commerce, effected transactions in, or induced or attempted to induce the purchase or sale of, securities without being registered with the Commission as a broker or dealer or as an associated person of a registered broker or dealer.

65.     By engaging in this conduct, each Defendant violated, and unless enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## PRAYER FOR RELIEF

For these reasons, the Commission respectfully requests that this Court enter a final judgment:

a.     Permanently enjoining Defendants VanBlaricum, Pope, Inglis, Leaverton, Hill, Rhodes, and Gilliam from violating Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) and 15(a) of the Exchange Act and Rule 10b-5 thereunder;

b.     Permanently enjoining Defendants VanBlaricum, Pope, Inglis, Leaverton, Hill, Rhodes, and Gilliam directly or indirectly, including, but not limited to, through any entity owned or controlled by them, from participating in the issuance, purchase, offer, or sale of any securities; provided, however, that such injunction shall not prevent them from purchasing or selling securities for his own personal account;

c.     Permanently prohibiting VanBlaricum, Pope, and Inglis from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or is required to file reports pursuant to Section 15(d) of the Exchange Act;

d.     Ordering each Defendant to disgorge ill-gotten funds and benefits obtained as a result of the violations alleged herein, or to which they were not otherwise entitled, plus prejudgment interest thereon;

e.     Ordering each Defendant to pay a civil penalty under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

f.     Granting such additional relief as the Court deems just, appropriate, and equitable.

DATED:        June 26, 2018.                    Respectfully submitted,

                                                */s/ Janie L. Frank*
                                                Janie L. Frank
                                                Texas Bar No. 07363050
                                                SECURITIES AND EXCHANGE COMMISSION
                                                Burnett Plaza, Suite 1900
                                                801 Cherry St., Unit #18
                                                Fort Worth, TX 76102-6882
                                                (817) 978-6478
                                                (817) 978-4927 (fax)
                                                FrankJ@sec.gov